

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

### NO. 2-09-179-CV

CITY OF CARROLLTON                                                        APPELLANT

V.

HEB PARKWAY SOUTH, LTD. AND                                APPELLEES
HEB/MEDICAL PARKWAY, LTD.

------------

FROM PROBATE COURT OF DENTON COUNTY

------------

## OPINION

------------

This appeal arises from the trial court's denial of the plea to the jurisdiction filed by the City of Carrollton ("the City") on takings claims brought by HEB Parkway South, Ltd. and HEB/Medical Parkway, Ltd. (collectively, "HEB"). In two issues, the City argues that the trial court erred by denying its plea to the jurisdiction on HEB's regulatory takings claims and on HEB's physical takings claim. Because we hold that HEB's regulatory takings claims are unripe and that HEB did not raise a physical

takings claim, we reverse the trial court's order and render judgment dismissing HEB's takings claims.

## I. Facts and Procedural History

From 1989 to 1992, the City of Carrollton made improvements to Hebron Parkway ("the parkway"), a street in the City. During construction, the City realigned a portion of Dudley Branch Creek, one of four major drainageways crossing the City. As early as 1992, erosion began occurring in the portion of Dudley Branch where construction had been done. In 1993, the City received approval to sell $510,000 in bonds to fund erosion control measures in Dudley Branch. The City did not, however, fix the problem in Dudley Branch at that time; the City contended that it did not construct erosion control measures because the property owner would not give the City the necessary easement.

HEB was formed in 1999 to develop property owned by Maurice Moore. MEMCO Management Group, LLC, manages assets of the Moore family, including HEB. HEB owns a140.304-acre tract of land and a 27.59-acre tract of land south of the parkway ("the property"). Dudley Branch runs through that property.

In 2000, the City amended its stormwater and flood protection ordinance. The ordinance requires property developers of channel sections to "consider and account for channel stabilization in their design[,] . . . whether they are left in their natural condition or are modified in any manner." If the developer owns all or a portion of a channel section or floodplain area affected by the ordinance, the developer is

2

required to improve the drainage channel or portion of the channel on the proposed development site so as to reduce water velocity in that channel section to 6.0 feet per second or below. The ordinance also imposes other requirements, depending on whether the property incorporates all or only a portion of the channel section. The city manager has the discretion "to require the implementation of the portion of these requirements as deemed necessary."

The ordinance further states that "[a]ny person aggrieved by a decision of the City Manager may appeal to the Planning and Zoning Commission ["P&Z"] for a variance. The decision of [P&Z] shall be final." The ordinance next reiterates that "[P&Z] . . . shall hear and decide requests for variances from the requirements of [the stormwater] ordinance."

In November 2000, HEB submitted a preliminary development plat for a single family home development on its property. City staff recommended approval of the plat, subject to staff stipulations, including a stipulation that "[t]he Homeowners Association shall be required to enter into a perpetual maintenance agreement with the City for the . . . floodplain." At HEB's request, P&Z approved removing this language from the "stipulations" section of the staff report and adding to the "informational comments" section a comment that "[t]his development must comply with the provisions of [the stormwater ordinance]."

Concerned that it would have to pay for improvements to Dudley Branch that HEB believed were the City's responsibility, HEB halted development proceedings

while it met with City staff about the stormwater ordinance's application. In a January 2001 agreement, the City agreed to study the ongoing flood plain issues to facilitate the development of the property.

Throughout 2001, HEB representatives met with City staff about the application of the stormwater ordinance to the proposed development. At a work session in 2001, the city council considered options for amending the ordinance. In September 2001, HEB expressed its support for the amendment in a letter to the mayor. The mayor responded by letter stating that amending the ordinance was not warranted and would not happen at that time. The director of public works also indicated in a letter that the ordinance would not be amended. After receiving the mayor's letter, HEB requested another meeting, but the City's attorney telephoned HEB's attorney and advised him that the City would not participate in additional meetings.

In March 2002, HEB and the City entered into a development agreement under which HEB agreed to construct the erosion control improvements to Dudley Branch. Under the plan, the City agreed to pay $510,000 (the amount approved for bonds in 1993), and HEB agreed to pay the rest of the cost. In January 2003, HEB submitted an engineered plan for erosion control on Dudley Branch, and the City approved the plan. HEB completed the improvements and then brought suit against the City for breach of contract and for inverse condemnation under the federal and state constitutions. The City filed a plea to the jurisdiction on all of HEB's claims

4

except damages for breach of contract. The trial court denied the motion, and the City now appeals that denial with respect to HEB's inverse condemnation claims.

## II. Regulatory Takings Claims

In its first issue, the City argues that the trial court did not have subject-matter jurisdiction over HEB's federal and state inverse condemnation claims alleging an exaction because these claims are permanently unripe. Specifically, the City argues that these claims are unripe because the evidence conclusively established that HEB never sought a final decision regarding the application of the City's regulations to HEB's property. Because the stormwater ordinance at issue assigned P&Z the authority to grant a variance, and because the record does not show that HEB sought a variance or that HEB's seeking such a variance would be futile, we agree.

*Standard of Review*

Ripeness is an element of subject matter jurisdiction.[1] Whether a trial court has subject matter jurisdiction is a question of law that we review de novo.[2] In determining whether a trial court has subject matter jurisdiction, we construe the pleadings liberally and accept as true the factual allegations in the pleadings.[3] If a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised.[4] We take as true all evidence favorable to the nonmovant, indulging every reasonable inference and resolving any doubts in the nonmovant's favor.[5]

The governmental unit asserting that the trial court lacks jurisdiction is required to meet the summary judgment standard of proof for its assertion.[6] As with a summary judgment motion, once the government meets that burden, the burden shifts to the plaintiff to show that there is a disputed material fact on the jurisdictional

---

[1] *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998), *cert. denied*, 526 U.S. 1144 (1999).

[2] *City of Arlington v. Randall*, 301 S.W.3d 896, 905 (Tex. App.—Fort Worth 2009, pet. filed).

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] *Id.*

6

issue.[7] If the evidence raises a fact question about jurisdiction, the trial court must deny the plea to the jurisdiction.[8] But if the evidence fails to raise a fact question on jurisdiction, as with a motion for summary judgment, the trial court rules on the plea to the jurisdiction as a matter of law.[9]

*Regulatory Takings*

When a landowner's property has been taken or damaged for public use without compensation, the landowner may bring an inverse condemnation proceeding.[10] The proceeding is "inverse" because the property owner brings the suit, as compared to a condemnation proceeding brought by a governmental entity to appropriate private property for a public purpose.[11]

Takings may be physical (that is, "a direct government appropriation or physical invasion of private property")[12] or regulatory (that is, based on a government

---

[7] ▲ *Id.*

[8] ▲ *Id.*

[9] ▲ *Id.*

[10] ▲ *City of Houston v. Texan Land & Cattle Co.*, 138 S.W.3d 382, 387 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

[11] ▲ *Compare id.* (reviewing the trial court's judgment on an inverse condemnation claim brought by a property owner), *with Bauer v. Lavaca-Navidad River Auth.*, 704 S.W.2d 107, 108 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.) (reviewing the trial court's award of damages in a condemnation proceeding brought by a state conservation and reclamation district).

[12] ▲ *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537, 125 S. Ct. 2074, 2080–81 (2005).

regulation).[13] A regulatory takings claim may be based on a number of different theories. One basis for a regulatory takings claim occurs when a government "requires an owner to suffer a permanent physical invasion of her property—however minor."[14] For example, a law that requires a landlord to permit a cable television company to install its facilities upon the landlord's property constitutes a compensable taking.[15] Under both the federal and Texas constitutions, this type of regulation constitutes a per se taking for which the landowner must be compensated.[16] Another category of per se taking under both the federal and Texas constitutions, sometimes referred to as a "Lucas-type 'total regulatory taking,'" occurs when a government regulation deprives a landowner of *all* economically beneficial use of the owner's property.[17]

---

[13] *See City of Argyle v. Pierce*, 258 S.W.3d 674, 683 (Tex. App.—Fort Worth 2008, pet. dism'd); *see also Lingle*, 544 U.S. at 547, 125 S. Ct. at 2087 (discussing theories of takings under the federal constitution).

[14] *Lingle*, 544 U.S. at 538, 125 S. Ct. at 2081; *see also Sheffield Dev. Co., Inc. v. City of Glenn Heights*, 140 S.W.3d 660, 671 (Tex. 2004).

[15] *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 421, 102 S. Ct. 3164, 3168 (1982).

[16] *See Sheffield*, 140 S.W.3d at 671 ("The direct, physical effect on property, though short of government possession, makes the regulation categorically a taking.").

[17] *Lingle*, 544 U.S. at 538, 548, 125 S. Ct. at 2081, 2087; *Hallco Tex., Inc. v. McMullen County*, 221 S.W.3d 50, 56 (Tex. 2006).

A regulation will also constitute a taking when it does not deprive a landowner of *all* of the property's economically beneficial use, but it does unreasonably interfere with the landowner's right to use and enjoy his property.[18] This type of claim is sometimes called a "Penn Central" takings claim, and it will generally arise when a government has denied a landowner approval to develop his property.[19]

The United States Supreme Court has recognized one other theory on which a regulatory takings claim may be based, resulting not from an outright denial of approval for development but from the government's conditional approval.[20] A takings claim may arise if a government conditions its approval for development on the landowner providing or doing something—that is, on an exaction. The Court has found that a land use exaction constituted a taking in two cases, both of which

---

[18] *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124, 98 S. Ct. 2646, 2659 (1978) (setting out factors for evaluating regulatory takings claims under the federal constitution); *see also Lingle*, 544 U.S. at 537–38, 125 S. Ct. at 2081 (noting that a regulation that "goes too far" will constitute a taking and that regulatory takings challenges outside of the two per se regulatory takings categories and the context of land-use exactions are governed by the standards set out in *Penn Central*); *Hallco Tex., Inc.*, 221 S.W.3d at 56.

[19] *See, e.g.*, *Mayhew*, 964 S.W.2d at 929, 937 (evaluating a town's denial of development approval under *Penn Central* standards and noting that in order for a regulatory takings claim to be ripe, there usually must be a rejected development plan).

[20] *See Lingle*, 544 U.S. at 548, 125 S. Ct. at 2087; *see also Town of Flower Mound v. Stafford Estates L.P.*, 135 S.W.3d 620, 630 (Tex. 2004) (distinguishing between a takings claim based on an exaction and takings claim based on "'unreasonable regulatory interference,'" that is, a "Penn Central" takings claim).

"involved dedications of property so onerous that, outside the exactions context, they would be deemed *per se* physical takings."[21]

The Supreme Court of Texas has addressed an exaction as a taking under the Texas constitution.[22] In *Stafford*, because neither party argued that the analysis would be different under the federal and Texas constitutions, the court assumed that if the government action at issue constituted a compensable taking under the federal constitution, it also constituted a compensable taking under the Texas constitution.[23] Likewise in the case before this court, neither party argues that the federal standard for determining whether an exaction constitutes a compensable taking does not apply to claims under the Texas constitution.

The Supreme Court of Texas has expanded on United States Supreme Court jurisprudence to address the issue of whether an exaction-as-a-taking claim may be based on something other than a requirement that a landowner dedicate real property to public use.[24] That court held in *Stafford* that a takings claim may also be

---

[21] ⬛ *See Lingle*, 544 U.S. at 547, 125 S. Ct. at 2087 (discussing *Dolan v. City of Tigard*, 512 U.S. 374, 114 S. Ct. 2309 (1994), and *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 107 S. Ct. 3141 (1987)).

[22] ⬛ *Stafford*, 135 S.W.3d at 623.

[23] ⬛ *Id.* at 630–31.

[24] ⬛ *See City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 702–03, 119 S. Ct. 1624, 1635–36 (1999) (stating that the court had not extended *Dolan*'s "rough proportionality" test beyond the context of exactions, which it referred to as "land-use decisions conditioning approval of development on the dedication of property to public use").

based on a requirement that the landowner spend private funds on property that already belongs to the public.[25] In that case, the Town of Flower Mound, Texas, ("the Town") required the developer landowner to rebuild a road abutting the residential subdivision proposed by the landowner.[26] This improvement was required by the Town's land development code.[27] The developer objected to the condition "at every administrative level in the Town" and requested that the Town grant an exception that was available under the code, all to no avail.[28] The developer rebuilt the road as requested and then brought an inverse condemnation claim.[29] The supreme court stated that for purposes of determining when a government's conditioning approval of development on an exaction constitutes a compensable taking, "we see no important distinction between a dedication of property to the public and a requirement that property already owned by the public be improved."[30] Based on that holding in *Stafford*, HEB argues that the exaction in this case constituted a compensable taking.

*Ripeness Requirement for Regulatory Takings Claims*

---

[25] *Stafford*, 135 S.W.3d at 640.

[26] *Id.* at 622.

[27] *Id.* at 623.

[28] *Id.* at 624.

[29] *Id.*

[30] *Id.* at 640.

11

As with any other claim, under both federal and Texas law, a regulatory takings claim must be ripe before a trial court will have subject matter jurisdiction over the claim.[31] In analyzing the ripeness of a challenge to a land use regulation under the Texas constitution, we apply federal jurisprudence.[32]

---

[31] *Mayhew*, 964 S.W.2d at 928 (noting that ripeness is an element of subject matter jurisdiction).

[32] *Id.* at 928–29.

Under federal law, as a prerequisite to the ripeness of regulatory takings claims, there must be "a final decision regarding the application of the regulations to the property at issue."[33]  That is, "a landowner may not establish a taking before a land-use authority has the opportunity, using its own reasonable procedures, to decide and explain the reach of a challenged regulation."[34]  Generally, until these procedures have been followed, no regulatory taking has been established because the extent of the restriction on the property is not yet known.[35]  In other words, "'[a] court cannot determine whether a regulation goes "too far" unless it knows how far the regulation goes."'[36]

Usually a "final decision" for purposes of a regulatory takings claim means "both a rejected development plan and the denial of a variance from the controlling regulations."[37]  But there is no requirement that an applicant make futile variance requests or reapplications.[38]  Thus, the requirement that a request for a variance be denied is applied flexibly so as to give the government an opportunity to "'grant

---

[33] *Id.* at 929.

[34] *Palazzolo v. Rhode Island*, 533 U.S. 606, 620–21, 121 S. Ct. 2448, 2459 (2001).

[35] *Id.*

[36] *Id.* at 622, 121 S. Ct. at 2460 (quoting *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348, 106 S. Ct. 2561, 2566 (1986)).

[37] *Mayhew*, 964 S.W.2d at 929.

[38] *Id.*

different forms of relief or make policy decisions which might abate the alleged taking."[39] The term "variance" encompasses "'other types of permits or actions [that] are available and could provide similar relief.'"[40] If a plaintiff brings a facial challenge to a regulation (rather than an as-applied challenge), no final decision about the regulation's application is required.[41] HEB brought an as-applied challenge to the ordinance in this case.

Neither the United States Supreme Court nor the Supreme Court of Texas has expressly stated that the standard for determining ripeness of other regulatory takings claims applies to land-use exaction takings claims. But we see no reason to apply a different standard,[42] as the purpose of the ripeness requirement for regulatory takings cases generally would also apply to land-use exactions cases. That is, whether the regulation is used to deny development approval or to exact

---

[39] *Id.* (quoting *S. Pac. Transp. Co. v. City of Los Angeles*, 922 F.2d 498, 503 (9th Cir. 1990), *cert. denied*, 502 U.S. 943 (1991)).

[40] *Id.* at 930 (quoting *S. Pac. Transp. Co.*, 922 F.2d at 503).

[41] *Id.*

[42] *See, e.g.*, *Stafford*, 135 S.W.3d at 638 (noting that there is no practical difference between "approval on condition and denial for want of the condition"); *Mayhew*, 964 S.W.2d at 929 (stating broadly that "in order for a regulatory takings claim to be ripe, there must be a final decision regarding the application of the regulations to the property at issue"); *see also City of Dallas v. Chicory Court Simpson Stuart L.P.*, 271 S.W.3d 412, 421–22 (Tex. App.—Dallas 2008, pet. denied) (applying the ripeness standards of regulatory takings claims generally to an exactions takings claim); *but see Del Monte Dunes*, 526 U.S. at 703, 119 S. Ct. at 1635 (distinguishing between exactions cases and denial-of-development cases).

14

some public benefit, we do not know if the regulation goes too far if we do not know how far it goes, and the government must be given the chance to abate the alleged taking. In the context of land-use exactions cases, what acts by the government will constitute a denial of a development plan will, as in other regulatory takings cases, turn on the facts of each case. Although a landowner may not receive an outright denial of approval of a plan that does not include the exaction, the government may give conditional approval in a manner that makes reasonably clear that the conditional approval is the functional equivalent of a denial of any plan that does not include the exaction.[43] Just as in other regulatory takings cases, the landowner must object to the exaction so as to give the government the opportunity to exercise its discretion and to establish the permissible uses of the property "to a reasonable degree of certainty."[44]

*HEB's Development Application*

In this case, HEB did not submit a development application that excluded the requested improvements and that was denied by P&Z, and it is P&Z, not staff, that

---

[43] ▲ *Stafford*, 135 S.W.3d at 638 (noting that there is no practical difference between conditional approval and denial for want of a condition).

[44] ▲ *Palazzolo*, 533 U.S. at 620, 121 S. Ct. at 2459 (noting that a takings claim is ripe "once it becomes clear that the agency lacks the discretion to permit any development, or the permissible uses of the property are known to a reasonable degree of certainty").

by City ordinance has authority to deny plat applications.[45] Furthermore, even if comments by City staff or council regarding their interpretation of the ordinance could constitute a preemptive denial of such an application, notwithstanding P&Z's authority over such matters, it is uncontroverted that HEB never applied for a variance.

HEB argues, however, that it did not have to request a variance because doing so would have been futile. HEB contends that it worked with City staff to try to avoid having to comply with the ordinance. The record shows that the City council would not amend its ordinance and that the City staff and City council showed every sign of expecting HEB to comply with the ordinance in accordance with City staff's interpretation of that ordinance. The City's attorney even told HEB that the City would not have any more meetings with HEB. But all of HEB's attempts to avoid application of the ordinance involved trying to amend the ordinance or the City's interpretation of the ordinance, rather than seeking a variance.

A city's refusal to amend its ordinance is not a P&Z board's refusal to grant a variance. The ordinance in this case expressly provides that P&Z may grant a variance and that P&Z's decision on the matter is final. P&Z is not the same as City staff or City council. Although the record shows City council's position on amending

---

[45] Carrollton, Tex., Subdivision Ordinance, art. III., § A (1993) (stating that a plat application is considered filed when it has been submitted to the planning department and placed on the agenda for P&Z and that a plat shall be considered approved if it is not disapproved by P&Z within thirty days of filing), *amended by* Carrollton, Tex., Ordinance 3301 (2009).

16

the ordinance, nothing in the record shows that P&Z would not have granted a variance to HEB.

> HEB's representative testified in the hearing on the plea to the jurisdiction that

> [w]e are going forward on the basis that no variance is requested because no variance is requested by any developer in the City . . . . That's not how the ordinance is operated, and there is no creek that has been repaired by the City . . . under any variance is done under the ordinance [sic].

But he went on to acknowledge that, with respect to other completed developments that were subject to the ordinance, "I'm not sure that I have knowledge of whether variances were sought." Nothing in the record demonstrates that other developers had requested variances from the same ordinance and that P&Z never granted those requests.

HEB's representative also stated that he had discussed the option of a variance with the City's director of public works, "and . . . we knew we didn't have any staff support for a variance." But the opinion of staff is not the same as a determination from P&Z. This case is different from *Stafford*, in which the developer sought an exception to the applicable regulation, which was denied.[46] Although Patterson testified that the City's attorney informed HEB's attorney that there would be "no more meetings," his testimony does not indicate that HEB sought a meeting about the possibility of obtaining a variance or about anything other than changing the ordinance or City staff's interpretation of the ordinance. And nothing in the

---

[46] *See Stafford*, 135 S.W.3d at 624.

record indicates that the City's attorney had been authorized to speak on behalf of P&Z with respect to variance requests.[47]

HEB argues that the staff recommendation stated that no permit application would be approved unless HEB paid for the creek improvements. But the staff recommendation on its face does not show that the City or P&Z would not allow HEB to develop its property without paying for creek improvements. The relevant staff comment simply states that the development "must comply with the provisions of [the stormwater ordinance,]" without stating what compliance would entail or whether staff would recommend denial of a variance, let alone what P&Z would do. And this language was apparently included at HEB's request. Originally, the staff stipulations stated that "[t]he Homeowner's Association shall be required to enter into a perpetual maintenance agreement with the City for the area shown as floodplain." HEB requested that the stipulation be moved to "informational comments" and be amended. Staff's response to the requested change included this note:

> The approved stipulation [as originally worded] reflects staff's interpretation of [the stormwater ordinance]. The ordinance provides the city with the ability to 'elect' who is responsible for the maintenance of the drainage area. Staff concurs that *this determination is more appropriate during the review of the final plat* and engineering plans. [Emphasis added].

---

[47] *See Desoto Wildwood Dev., Inc. v. City of Lewisville,* 184 S.W.3d 814, 826 (Tex. App.—Fort Worth 2006, no pet.) (stating that because no evidence showed that the city attorney had been authorized by the city council to act for it on a matter, the attorney's statements were not binding on the matter).

Rather than stating that the City was at that point requiring HEB to improve the creek, it appears that the City was leaving open until the final platting stages the question of who would have to pay for maintenance of drainage areas in the development. It does not show that at the time HEB filed its preliminary plat applications, the City would not approve any development unless HEB paid for creek improvements and that P&Z would not grant a variance.

HEB compares this case to *Mayhew* and argues that under that case, its regulatory takings claims are ripe. In *Mayhew*, landowners seeking to build a planned development on their property worked for years with the Town of Sunnyvale to obtain a permit to develop their property.[48] The Mayhews spent over $500,000 conducting studies and preparing reports in support of their proposed development.[49] P&Z recommended denying the Mayhews' application.[50] The Mayhews then met with a Town committee that had been appointed to negotiate with them and agreed to change their application in attempt to gain approval from the Town council.[51] The amended development plan represented the minimum development that the Mayhews believed would make an economically viable use of their land.[52] But

---

[48] *Mayhew*, 964 S.W.2d at 925–26.

[49] *Id.* at 926.

[50] *Id.*

[51] *Id.*

[52] *Id.* at 931.

19

although the Mayhews amended their application to conform with the tentative agreement resulting from the negotiations, the Town council rejected the Mayhews' modified application.[53] The supreme court held that under these facts, the Mayhews' claim was ripe.[54]

HEB asserts the facts in *Mayhew* are similar to the facts in this case. It argues that it hired experts to meet with City officials over a span of more than two years, costing HEB more than $600,000, and that the City gave no indication of approving any plan that did not include HEB constructing improvements to Dudley Branch. Thus, HEB argues, as in *Mayhew*, it was not required to submit an application that did not include the improvements, and any request for a variance would have been futile.

But this case is factually distinguishable from *Mayhew*. *Mayhew* involved a planned development, and in a planned development, "the density, type, and location of particular uses in the development are left to the planning process and are determined through negotiations between the developer and the town."[55] In this case, HEB wished to construct a residential subdivision, not a planned development, and its negotiations with the City centered on its efforts to have the ordinance amended or to change City staff's interpretation of the ordinance, not on the type of

---

[53] *Id.*

[54] *Id.* at 932.

[55] *Id.* at 931.

20

development and uses that would be included on the property. Furthermore, in *Mayhew*, a holding that the developer had not exhausted its administrative remedies would have required the developer to expend resources and the town to spend time considering a development proposal that, due to economic impracticability, the developer would never actually develop.[56] And, importantly, "there was no issue that the proper entity had not rejected the development application."[57] In this case, however, nothing shows that HEB would not have developed the property if it had to pay for the improvements—in fact, the opposite is true because it did develop the property and pay for the improvements. And HEB also failed to show that it sought relief from the application of the stormwater ordinance from the right entity.

In a post-submission letter brief, HEB notes that the City had stated in its brief that the plat as ultimately constructed was dictated by federal requirements and that the type of project was under a nationwide project through the United States Army Corps of Engineers, which only allowed for a particular type of project. HEB asserts that P&Z could not waive these requirements. HEB appears to argue that it was not required to file an application or variance because the City could not waive the federal requirements. But even if federal requirements dictated what kind of improvements had to be made, this does not mean that the City could not elect to make the improvements itself or that the parties could not have reached some

---

[56] *Desoto*, 184 S.W.3d at 826 (distinguishing *Mayhew*).

[57] *Id.*

21

mutually-satisfactory agreement for the improvements. And HEB claims in its letter brief that certain City officials *could* provide relief, acknowledging that the federal creek improvement requirements did not require HEB to pay for them. HEB makes no explanation for why, given federal Corps of Engineers requirements, City council would have authority to amend the stormwater ordinance and City staff would have authority to interpret the ordinance in a manner that did not require HEB to pay for the improvements, but P&Z would not have authority to grant a variance. The problem, once more, is that HEB never asked the appropriate agency about a variance in the first place.

The ordinance allows P&Z to grant a variance, and HEB never asked for one. Instead, it entered into a development agreement with the City in which it agreed to construct the improvements. Because ripeness requires a showing that the landowner asked for a variance or that requesting one would have been futile, to affirm the trial court's denial of the plea to the jurisdiction, this court would have to hold that as long as one unit of city government wants to condition permit approval on an exaction, it is not necessary for the landowner to request relief from a different government unit with express authority to grant that relief. We decline to do so. Accordingly, we hold that under the facts of this case, HEB's regulatory takings claims under the federal and state constitutions are not ripe, and, because it is too late to obtain a variance to avoid constructing the improvements, the claims can never become ripe. We sustain the City's first issue.

22

### III. Physical Takings Claim Based on Damage to Property

In its second issue, the City argues that the trial court does not have subject matter jurisdiction over HEB's inverse condemnation claim based on physical damage because the evidence conclusively establishes that HEB did not own the property subject to this suit at the time the events complained of occurred.

In its petition, HEB asserted that

> [t]he City's failure to develop and maintain drainage facilities sufficient to accommodate the water run-off created by and after the development of [the parkway] as well as the negligent construction and maintenance of City-owned drainage channel through HEB's property resulted in the taking, damaging and/or diminution in value of the property in violation of the United States and Texas Constitutions.

HEB further alleged that "[t]he City's illegal use of drainage over, across and through HEB's property reduced HEB's developable property and increased HEB's development costs, thereby devaluating the whole property."

But in HEB's response to the City's plea to the jurisdiction alleging that HEB had no standing on a physical takings claim based on events prior to 1999, HEB stated that it had standing to assert takings claims that occurred prior to 1999 but that it "[did] not seek to recover compensation for a taking that occurred prior to" that time. In its brief on appeal, HEB again argues that it does not lack standing to assert takings claims that occurred prior to 1999, but its arguments in that respect all relate to the City's application of the stormwater ordinance and HEB's regulatory takings claim. HEB specifically states that "HEB seeks to recover damages resulting from

23

the City's exaction of improvements developed and financed by HEB" and that "[t]here is no evidence to establish HEB did not own the property at the time the *exaction claim* was ripe for adjudication." [Emphasis added.] HEB uses the City's acts in constructing the parkway and realigning Dudley Branch as taking control of Dudley Branch and thereby, under HEB's interpretation of the stormwater ordinance, obligating the City to maintain Dudley Branch. HEB does not appear to point to the City's actions prior to 1999 for any other purpose than to support its exaction claim.

From its brief, then, it appears that HEB did not assert a separate physical takings claim apart from its regulatory takings claim based on an exaction. That is, HEB's statements about the City's actions in constructing and failing to maintain the parkway and related drainage improvements were in support of its regulatory takings claim rather than an assertion of a separate takings claim based on physical damage to HEB property. We therefore overrule the City's second issue.

## IV. Conclusion

Having sustained the City's first issue and overruled the City's second issue, we reverse the trial court's denial of the City's plea to the jurisdiction. We render judgment dismissing HEB's regulatory takings claims, and we remand this cause to the trial court for further proceedings on HEB's remaining claims.

LEE ANN DAUPHINOT

24

JUSTICE

PANEL:  DAUPHINOT, MCCOY, and MEIER, JJ.

DELIVERED:  June 17, 2010