**Opinion filed August 30, 2013**



In The

# Eleventh Court of Appeals

_____

## No. 11-11-00237-CV

_____

## JUD WALTON, Appellant
## V.
## CITY OF MIDLAND, Appellee

**On Appeal from the 238th District Court**
**Midland County, Texas**
**Trial Court Cause No. CV-47,184**

## O P I N I O N

Jud Walton appeals the trial court's order granting the City of Midland's plea to the jurisdiction. In his sole issue, Walton contends that the trial court erred in granting the City's plea to the jurisdiction. We affirm.

*Background Facts*

Walton owns the surface estate of a 35.4-acre tract located inside the city limits of Midland. Endeavor owns an oil and gas lease that includes Walton's tract. Endeavor applied for a permit from the City to drill a well on Walton's tract. The City initially denied Endeavor's application. Endeavor subsequently filed suit,

contending that the City's decision constituted inverse condemnation. Endeavor and the City ultimately reached a settlement agreement, and as part of their agreement, the City granted the previously denied drilling permit application. Walton alleges that the City's act of granting Endeavor a permit to drill constitutes a regulatory taking under TEX. CONST. art. I, § 17.

In his trial court pleadings, Walton asserted that the granting of the permit to drill on his property constituted a physical invasion of his surface estate. He additionally alleged that a provision of the permit that required the drilling of a water well for maintaining trees constituted an invasion of his groundwater. He asserted a cause of action for inverse condemnation based upon these allegations.

On appeal, Walton focuses primarily on the water well requirement of the drilling permit. He asserts that this provision constitutes a physical invasion of his property that is indefinite and without restriction. The requirement provides in relevant part as follows:

> Operator shall drill one (1) freshwater well for the provision of irrigation water to maintain the trees required above. Said water well shall not be closer than five hundred (500) feet to the permitted oil and gas well. Operator shall maintain all required trees in a healthy and growing condition. The operator is authorized to drill only one well for irrigation purposes.

The drilling permit also required Endeavor to place trees around the well and to provide for their care for a period of time. Walton contends that the water well requirement required Endeavor to drill a water well on his property for landscaping purposes and that this requirement exceeded Endeavor's right to use water under its oil and gas lease.

### Standard of Review

A plea to the jurisdiction challenges a court's subject-matter jurisdiction and is a question of law that is reviewed de novo. *Tex. Dep't of Parks & Wildlife v.*

2

*Miranda*, 133 S.W.3d 217, 227–28 (Tex. 2004). Subject-matter jurisdiction is essential for a court to have the authority to resolve a case. *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638–39 (Tex. 1999). To invoke the subject-matter jurisdiction of a court, the one bringing the claim must allege facts that affirmatively demonstrate that the court has jurisdiction to hear it. *Miranda*, 133 S.W.3d at 226; *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993). To prevail on a plea to the jurisdiction, a defendant must show an incurable jurisdictional defect apparent from the face of the pleadings that makes it impossible for the plaintiff's petition to confer jurisdiction on the district court. *Bybee v. Fireman's Fund Ins. Co.*, 331 S.W.2d 910, 914 (Tex. 1960). Courts must consider evidence when necessary to decide jurisdictional issues. *Miranda*, 133 S.W.3d at 221; *Tex. Natural Res. Conservation Comm'n v. White*, 46 S.W.3d 864, 868 (Tex. 2001); *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554–55 (Tex. 2000). We do not look to the merits of the plaintiff's case in conducting our review, but consider only the plaintiff's pleadings and the evidence pertinent to the jurisdictional inquiry. *Miranda*, 133 S.W.3d at 225–26. We presume all well-pleaded facts to be true and construe the pleadings liberally in favor of conferring jurisdiction. *Id.* at 226–28.

Sovereign immunity, unless waived, protects the State and its various divisions from damage suits. *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 694 (Tex. 2003); *Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 594 (Tex. 2001). As opposed to the State and its various divisions, the term "governmental immunity" is the appropriate term to apply to immunity enjoyed by political subdivisions of the State, including counties, cities, and school districts. *Wichita Falls State Hosp.*, 106 S.W.3d at 694 n.3. Governmental immunity has two components: immunity from suit and immunity from liability. *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006). Immunity from suit bars suit against a

governmental entity altogether. *Id.* When a political subdivision of the State is immune from suit under the doctrine of governmental immunity, a court lacks subject-matter jurisdiction over the suit. *Jones*, 8 S.W.3d at 638. Immunity from suit can be waived only by statute or legislative resolution. *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 405 (Tex. 1997). Governmental immunity from suit is properly asserted in a plea to the jurisdiction. *See Miranda*, 133 S.W.3d at 225–26.

*Analysis*

Walton has alleged a claim for inverse condemnation against the City. When a landowner's property has been taken or damaged for public use without compensation, the landowner may bring an inverse condemnation proceeding. *See City of Carrollton v. HEB Parkway South, Ltd.*, 317 S.W.3d 787, 792 (Tex. App.— Fort Worth 2010, no pet.). The proceeding is "inverse" because the property owner brings the suit, as compared to a condemnation proceeding brought by a governmental entity to appropriate private property for a public purpose. *Id.* The Texas constitution provides a clear and unambiguous waiver of immunity from suit for inverse condemnation claims under the takings clause. TEX. CONST. art. I, § 17; *El Dorado Land Co., L.P. v. City of McKinney*, 395 S.W.3d 798, 801 (Tex. 2013); *Steele v. City of Houston*, 603 S.W.2d 786, 791 (Tex. 1980). However, a trial court lacks jurisdiction and should grant a plea to the jurisdiction where a plaintiff cannot establish a viable takings claim. *Tex. Dep't of Transp. v. A.P.I. Pipe & Supply, LLC*, 397 S.W.3d 162, 167 (Tex. 2013).

The elements of an inverse condemnation claim are (1) the governmental entity intentionally performed an act in the exercise of its lawful authority, (2) that resulted in the taking, damaging, or destruction of the claimant's property, (3) for public use. *See City of Houston v. Trail Enters., Inc.*, 377 S.W.3d 873, 878 (Tex. App.—Houston [14th Dist.] 2012, pet. filed). An inverse condemnation claim may be based on a physical or regulatory taking. *Mayhew v. Town of Sunnyvale*, 964

4

S.W.2d 922, 933 (Tex. 1998). Walton's inverse condemnation claim involves an alleged regulatory taking.

The Texas Supreme Court recently addressed regulatory takings in *Edwards Aquifer Authority v. Day*, 369 S.W.3d 814, 837–41 (Tex. 2012). Citing *Sheffield Development Co. v. City of Glenn Heights*, 140 S.W.3d 660 (Tex. 2004), the court noted that Texas courts have generally been guided by the United States Supreme Court's construction and application of the similar guarantee provided by the Fifth Amendment to the United States Constitution. The court recognized that the Supreme Court has developed three analytical categories for regulatory takings as summarized in *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005). The court quoted the following text from *Lingle*:

> Our precedents stake out two categories of regulatory action that generally will be deemed *per se* takings for Fifth Amendment purposes. First, where government requires an owner to suffer a permanent physical invasion of her property—however minor—it must provide just compensation. *See Loretto v. Teleprompter Manhattan CATV Corp.*, [458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868] (1982) (state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking). A second categorical rule applies to regulations that completely deprive an owner of "*all* economically beneficial us[e]" of her property. [*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (emphasis in original).]

> . . .

> Outside these two relatively narrow categories (and the special context of land-use exactions ... ), regulatory takings challenges are governed by the standards set forth in *Penn Central Transp. Co. v. New York City*, [438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631] (1978). The Court in *Penn Central* acknowledged that it had hitherto been "unable to develop any 'set formula'" for evaluating regulatory takings claims, but identified "several factors that have particular significance." [*Id.* at 124, 98 S.Ct. 2646.] Primary among those

factors are "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." *Ibid.* In addition, the "character of the governmental action"—for instance whether it amounts to a physical invasion or instead merely affects property interests through "some public program adjusting the benefits and burdens of economic life to promote the common good"—may be relevant in discerning whether a taking has occurred. *Ibid.* The *Penn Central* factors—though each has given rise to vexing subsidiary questions—have served as the principal guidelines for resolving regulatory takings claims that do not fall within the physical takings or *Lucas* rules.

Although our regulatory takings jurisprudence cannot be characterized as unified, these three inquiries (reflected in *Loretto*, *Lucas*, and *Penn Central*) share a common touchstone. Each aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain. Accordingly, each of these tests focuses directly upon the severity of the burden that government imposes upon private property rights.

*Day*, 369 S.W.3d at 838–39 (quoting *Lingle*, 544 U.S. at 538–39) (alterations in original).

Walton contends that the water well requirement in the permit constitutes a taking under *Loretto* because it required him to suffer a permanent physical invasion of his property. We disagree. We initially note that the provision did not require Endeavor to drill the water well on Walton's property. The requirement only provided that the water well was to be located no closer than 500 feet to the permitted oil and gas well. Thus, the water well could have been drilled on someone else's property and still have complied with the permit's requirement. Accordingly, the water well provision did not require Walton to suffer a permanent physical invasion of his property.

6

Additionally, a drilling permit granted to Endeavor to drill an oil and gas well did not compel Walton to suffer a physical invasion of his property. The Texas Supreme Court held in *Magnolia Petroleum Co. v. Railroad Commission*, 170 S.W.2d 189, 191 (Tex. 1943), that a permit to drill an oil and gas well is "purely a negative pronouncement" that "grants no affirmative rights to the permittee to occupy the property." The court recently reaffirmed the holding in *Magnolia Petroleum Co.* in *FPL Farming Ltd. v. Environmental Processing Systems, L.C.*, 351 S.W.3d 306, 310–12 (Tex. 2011), wherein the court held that, as a general rule, a permit granted by an agency does not act to immunize the permit holder from civil tort liability from private parties for actions arising out of the use of the permit. The court in *FPL Farming* cited a recent opinion from the Amarillo Court of Appeals for the following proposition: "'[O]btaining a permit simply means that the government's concerns and interests, at the time, have been addressed; so, it, as a regulatory body, will not stop the applicant from proceeding under the conditions imposed, if any.'" 351 S.W.3d at 311 (alteration in original) (quoting *Berkley v. R.R. Comm'n of Tex.*, 282 S.W.3d 240, 243 (Tex. App.—Amarillo 2009, no pet.)).

Under the authorities cited above, the permit issued by the City did not grant any affirmative rights to Endeavor to occupy or use Walton's property. The permit did not authorize Endeavor to undertake any action that was not otherwise authorized, and it did not shield Endeavor from any liability to Walton.[1] Securing a permit does not immunize the recipient from the consequences of its actions if those actions affect the rights of third parties. *Berkley*, 282 S.W.3d at 243. Furthermore, a permit also does not authorize the recipient to act with impunity toward third parties. *Id.*

---

[1]We express no opinion regarding Endeavor's potential liability to Walton for any action it took on his property.

The ordinance at issue in *Loretto* provided that a landlord "must permit a cable television company to install its cable facilities upon his property." 458 U.S. at 421. The ordinance in *Loretto* also contained a provision that limited the compensation due the landlord from the cable company to a one-time payment of one dollar for the intrusion. 458 U.S. at 423–24. *Loretto* is inapplicable to the facts in this case because the permit issued by the City does not require Walton to acquiesce in any action taken by Endeavor. Furthermore, the permit does not contain any provisions limiting the compensation that Walton could seek from Endeavor.[2]

Walton also contends that he asserted a viable claim under *Lucas*. As noted previously, *Lucas* applies to regulations that completely deprive an owner of all economically beneficial use or productive use of his or her property. *Day*, 369 S.W.3d at 838; *Sheffield*, 140 S.W.3d at 671. A *Lucas* taking is sometimes referred to as a total regulatory taking. *Lingle*, 544 U.S. at 538, 548; *Hallco Tex., Inc. v. McMullen Cnty.*, 221 S.W.3d 50, 56 (Tex. 2006). It is limited to the extraordinary circumstance when no productive or economically beneficial use of land is permitted and the landowner is left with a token interest. *Sheffield*, 140 S.W.3d at 671.

Walton contends that the City's act of granting a permit to Endeavor to drill an oil and gas well on his property deprived him of all economically beneficial use of the property. In asserting this contention, Walton states that, at the time that he acquired his property, he did not anticipate that the City would permit the owner of the mineral estate to drill on his property. We conclude that Walton has not

---

[2]Walton contends that the permit contains "coercive" provisions designed to force a landowner to acquiesce in the drilling of a water well on his property. He contends that, if the landowner consents to the water well, the permit requires the operator to periodically test the water well but that, if the landowner does not consent, the operator is not required to test the well. However, Walton has not cited a provision in the permit setting out this requirement for the water well to be drilled for landscaping purposes.

asserted a viable claim under *Lucas*. Walton's evidence indicates that his property had a value of at least $3,000 per acre after Endeavor drilled the well. Accordingly, the granting of the permit did not deprive him of all economically beneficial use of the property to the extent that he was only left with a token interest.

Walton concedes that he acquired the property subject to the mineral severance in favor of Endeavor and its predecessors. As noted by Walton, "the City simply allowed what the title itself would have allowed." Thus, the City's act of granting a permit to Endeavor to drill an oil and gas well comports with the parties' already existing property rights. As noted previously, the permit did not confer any rights to Endeavor that it did not otherwise possess. Accordingly, the permit granted by the City to Endeavor simply does not rise to the level of a taking. Walton's sole issue on appeal is overruled.

*This Court's Ruling*

We affirm the judgment of the trial court.


TERRY McCALL

JUSTICE


August 30, 2013

Panel consists of: Wright, C.J.,
McCall, J., and Judge Herod.[3]

Willson, J., not participating.

---

[3]Steven R. Herod, Judge, 91st District Court, Eastland, sitting by assignment.