**Reversed and Rendered and Majority and Dissenting Opinions filed August 9, 2012.**



In The

# Fourteenth Court of Appeals

### NOS. 14-10-00944-CV and
### 14-11-00417-CV

### THE CITY OF HOUSTON, TEXAS, Appellant

### V.

### TRAIL ENTERPRISES, INC. D/B/A WILSON OIL COMPANY, THOMAS G. ROGERS, CATHERINE BAUMANN, CAROLINE WHIPPLE, MRS. S. KELLEY BRUCE, JOHN HOBBS KELLEY, MARY VIRGINIA KELLEY INGRAM, DAYSTAR OIL AND GAS CORPORATION, JOHN ALEXANDER, REBECCA BRUCE JONES, ELEANOR BRUCE MCREYNOLDS, ROBERT D. BRUCE, AND INTERVENOR, MARY BRUCE, Appellees

**On Appeal from the County Civil Court at Law No. 1**
**Harris County, Texas**
**Trial Court Cause No. 799234**

## O P I N I O N

This is an inverse condemnation action in which Trail Enterprises, Inc., d/b/a Wilson Oil Company ("Trail"), and other plaintiffs (collectively "appellees") sued the City of Houston, Texas ("the City"), alleging that restrictions on the drilling of oil and gas wells in the area of Lake Houston constituted a compensable taking of their property

rights.[1] Each appellee owns a mineral interest in the subject property. The trial court found that there was a taking and awarded appellees nearly $17 million based on a jury verdict on damages. In its judgment, the court also awarded certain of the mineral interests in the property to the City. Both sides appeal. The City contends among other things that no compensable taking occurred, and appellees contend that the City should not have been awarded the mineral interests. We reverse and render judgment that appellees take nothing.

## I. Background

In 1967, the City enacted an ordinance restricting the drilling of new oil and gas wells in the "control area" around Lake Houston, a major source of public drinking water. The original restrictions prevented drilling on property regardless of whether the property was within the City's boundaries or merely within its extraterritorial jurisdiction ("ETJ").[2] Appellees each own a mineral interest in a parcel of property which in 1967 was located in the City's ETJ. In 1977, "control area" was redefined by ordinance so that the restrictions were no longer applicable to areas within the city limits but were retained for areas in the ETJ (and thus for all of appellees' property).[3] In 1996, the appellees' property was annexed into the City, thus effectively ending the drilling restrictions on the property. Approximately eleven months later, in 1997, the City again changed the governing ordinances so that the drilling restrictions were imposed on properties around

---

[1] The other plaintiffs include Thomas G. Rogers, Catherine Baumann, Caroline Whipple, Mrs. S. Kelley Bruce, John Hobbs Kelley, Mary Virginia Kelley Ingram, Daystar Oil and Gas Corporation, John Alexander, Rebecca Bruce Jones, Eleanor Bruce McReynolds, and Robert D. Bruce. Mary Bruce intervened in the litigation and is also included in the term "appellees."

[2] A city's ETJ is established by Chapter 42 of the Texas Local Government Code and extends out from a city's boundaries for a specified distance based on the particular city's population. Tex. Loc. Gov't Code §§ 42.001–021.

[3] The City states in its brief that it "does not concede that the effect of the 1977 amendment was to eliminate the application of the drilling regulations to areas inside the City. However, in order to simplify an already complex case, the City has chosen not to contest that issue in this appeal." *See generally Maguire Oil Co. v. City of Houston*, 69 S.W.3d 350, 359-60 (Tex. App.—Texarkana 2002, pet. denied) (discussing the City's arguments regarding whether drilling was permitted inside the city limits during the eleven-month period).

Lake Houston within both the City proper or its ETJ. It is undisputed that no new drilling occurred during the eleven months in which the restrictions were not in place on appellees' property. It is also undisputed that none of appellees obtained their property rights during the eleven-month period. The parties further stipulated below that wells existing on the property from prior to the 1967 drilling prohibition continued to produce minerals even during periods when new drilling was prohibited.

These facts have generated several lawsuits and numerous appeals. In 1995 (before the annexation), Trail sued the City claiming that the 1967 ordinance constituted a compensable taking. The trial court, and subsequently this court, determined that this claim was barred by the statute of limitations. *Trail Enters., Inc. v. City of Houston*, 957 S.W.2d 625, 633 (Tex. App.—Houston [14th Dist.] 1997, writ denied) ("*Trail I*"). In 1999, Trail filed a lawsuit asserting that the City's 1997 actions (*i.e.*, making the drilling restriction applicable to all property around Lake Houston and not just that in the ETJ) constituted a taking. The trial court granted summary judgment favoring the City and this court affirmed in part and reversed and remanded in part. *Trail Enters., Inc. v. City of Houston*, No 14-01-00441-CV, 2002 WL 389448 (Tex. App.—Houston [14th Dist.] Mar. 14, 2002, no pet.) (not designated for publication) ("*Trail II*"). *Trail II*, however, was subsequently dismissed by agreement apparently due to jurisdictional concerns.

In 2003, Trail, joined by the other appellees, filed the present lawsuit. In 2005, the trial judge held a bench trial on the inverse condemnation issue and concluded that a taking had occurred. The issue of damages was then presented to a jury, which found that the City's actions diminished the fair market value of the mineral estate in the subject property by $19,046,700. Subsequently, the City argued that appellees' claims were not ripe because appellees had not filed a formal application for new drilling permits after the 1997 change in the governing ordinances. The trial judge agreed and dismissed the case. On appeal, the Texas Supreme Court held that the claims were ripe and remanded back to the trial court for further proceedings on the merits. *City of Houston v. Trail Enters., Inc.*, 300 S.W.3d 736 (Tex. 2009) ("*Trail IV*") (reversing *Trail Enters., Inc. v. City of Houston*,

3

255 S.W.3d 105 (Tex. App.—Waco 2007) ("*Trail III*").[4]

On remand, the trial court again held an evidentiary hearing and again concluded that a compensable taking had occurred. The court then entered a monetary judgment for appellees approaching $17 million (based on the prior jury findings and a stipulation as to the percentage of ownership in the mineral estate held by appellees). In its judgment, the court also awarded to the City all the oil and gas not recoverable from existing wells. As indicated above, both sides appealed: the City challenging the takings finding and damages and appellees contesting the award of an interest to the City.

## II.  The City's Appeal

In three issues, the City contends that the trial court erred in granting judgment favoring appellees because (1) the City adversely possessed the mineral interests and appellees' claims are therefore barred by the applicable statute of limitations; (2) appellees failed to establish a taking occurred; and (3) appellees failed to present competent evidence of compensable damages. Finding the second issue dispositive, we do not address the City's first or third issues or any issues appellees raise in their cross appeal.

## III.  Governing Law

In their petition, appellees alleged that the City had taken or damaged their property without adequate compensation and without due process in violation of article I, section 17 of the Texas Constitution. Tex. Const. art. I, § 17. In its second issue on appeal, the City contends that the trial court erred in determining that a compensable taking had occurred. The question of whether a taking has occurred is a matter of law on which an appellate court owes no deference to a trial court's determination. *Mayhew v. Town of Sunnyvale*, 964 S.W.3d 922, 937 (Tex. 1998).[5] The burden of proving that a

---

[4] The intermediate appeal of *Trail III* was assigned to the Tenth Court of Appeals.

[5] We depend on the trial court, however, to resolve disputed fact issues regarding the extent of governmental interference. *Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 673 (Tex. 2004).

4

taking occurred is on the property owners. *Trail IV*, 300 S.W.3d at 737-38.

The seminal case in Texas on this issue is *Sheffield Development Company v. City of Glenn Heights*, 140 S.W.3d 660 (Tex. 2004). In *Sheffield*, the court largely interpreted and followed the United States Supreme Court's opinion in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978). *See Sheffield*, 140 S.W.3d at 669, 671-72 (adopting the *Penn Central* Court's analysis under the Fifth Amendment to the United States Constitution for use in cases under article I, section 17 of the Texas Constitution). According to these cases, the consideration of whether a taking has occurred typically involves an ad hoc, highly fact-specific analysis. *Sheffield*, 140 S.W.3d at 672. In other words, there is usually no bright-line test and the relevant factors may vary from case to case. *Id*. The inquiry involves a determination of whether "justice and fairness" require economic injuries caused by government action to be compensated by the government actor. *See Penn Central*, 438 U.S. at 123-24; *Sheffield*, 140 S.W.3d at 670-71.

At least two categories of cases have been identified as not requiring the *Penn Central* fact-specific analysis: when there is an actual physical invasion of the property at issue and when the regulation in question denies the owner *all* economically beneficial use of his land. *Sheffield*, 140 S.W.3d at 671. In addition to these two situations, a landowner also can prove a taking occurred without a *Penn Central* analysis by demonstrating that the regulation in question did not advance a legitimate state interest. *Id*.

There is no allegation here of an actual physical invasion of appellees' property. Further, although appellees contend that the City's current ordinances prevent them from drilling any new wells on the subject property and generally minimize the City's reason for the regulation at issue, they do not argue that they have been deprived of *all* economic benefit from their property or that the ordinances at issue were not related to a legitimate interest.[6] Moreover, to the extent appellees may have intended to advance these

_____

[6] Appellees state in their brief that the prohibition on new wells "devalued" their mineral estate and deprived them "of substantially all of their economical use of their property." In their petition,

5

arguments, sufficient evidence showed that appellees still derived an economic benefit from existing wells on the property, and as will be discussed below, protection of public drinking water is a legitimate governmental interest. *See Trail III*, 255 S.W.3d at 113 ("Here, the ordinance did not deprive Trail of 'all economically beneficial or productive use of the property,' as evidenced by Trail's continued receipt of royalty payments after the date the ordinance was adopted.").[7] Therefore, we analyze this case using the *Penn Central* factors.[8]

Under *Penn Central*, determining whether regulation becomes too much like a physical taking, and thus necessitates compensation for an individual property owner, requires balancing the public's interest against the private landowner. *Sheffield*, 140 S.W.3d at 671-72. Three nonexclusive factors have been highlighted as important in striking this balance: (1) the character of the governmental action; (2) the extent to which the regulation has interfered with reasonable and distinct investment-backed expectations; and (3) the economic impact of the regulation on the claimant. *See id*. at 672 (citing *Penn Central*, 438 U.S. at 124, and *Connolly v. Pension Benefits Guar. Corp.*, 475 U.S. 211, 225 (1986) (restating *Penn Central* factors)). Generally, no one single factor should be considered paramount. *Id*. The analysis focuses on the parcel of land as

---

appellees stated that their "mineral estates have been damaged or taken in that a significant portion of the oil and gas reserves underlying the Property can not [sic] be developed, and has been irrevocably lost."

[7] Additionally, the corporate representative for one of appellees, Daystar, stated that "[a]ll existing wells have a lot of potential." There also was considerable other evidence regarding continued production from existing wells. Two of appellees' experts, Richard Pomrenke and William Chesser, however, described the production from existing wells in a report as being of "minimal commercial value." They did not define that phrase with specificity.

The United States Supreme Court and the Texas Supreme Court have emphasized that the category of cases where regulation denies *all* beneficial use is "limited to 'the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted.'" *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 330 (2002) (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992) (emphasis in original)); *Sheffield*, 140 S.W.3d at 171 (quoting *Tahoe-Sierra Pres. Council*).

[8] In its 2009 opinion in this case, the Texas Supreme Court stated that on remand, "[c]ertainly the trial court should determine if additional exploration is warranted into whether the owners have met their burden of demonstrating a taking under the balancing test articulated in *Penn Central*." *Trail IV*, 300 S.W.3d at 737-38.

a whole and not discrete segments of the parcel. *See Penn Central*, 438 U.S. at 130-31. Here, the parties do not claim that there are any other relevant factors other than those given in *Penn Central*.[9]

## IV. Governmental Interest

Regarding the first factor, the character of the governmental action, the City maintains that protection of the public water supply is immensely important. The 1997 ordinance provides:

> WHEREAS, in accordance with Section 401.002 of the Texas Local Government Code, and other applicable law, the City of Houston (the "City") is authorized to provide for the protection of and may prohibit the pollution of its water supply, and may police any watersheds both inside and outside the City's boundaries; and

> WHEREAS, in enacting recent amendments to the Safe Drinking Water Act, Congress determined that effective protection of the public health requires enhanced protection of the source waters of public water systems; and

> WHEREAS, because Lake Houston is a primary source of surface water for the citizens of the City, the importance of which is expected to increase with the construction of additional treatment facilities, it is vital that the water quality of Lake Houston be protected from possible sources of contamination; and

> WHEREAS, article IV, chapter 23 of the Code of Ordinances, Houston, Texas, provides for the regulation of certain activities within the City's extraterritorial jurisdiction around Lake Houston known as the "control area," to prevent such potential sources of pollution from endangering the City's water supply; and

> WHEREAS, as a result of recent annexation, a significant portion of

---

[9] Although the present case involves some of the same City of Houston ordinances that were of concern in our prior opinions in a lawsuit filed by Maguire Oil Company against the City, the legal issues addressed are substantially different such that those prior opinions do not govern our analysis in the present case. *See City of Houston v. Maguire Oil Co.*, 342 S.W.3d 726 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (holding regulatory taking occurred where City unreasonably interfered with extraction of minerals by enforcing an inapplicable regulation; City did not challenge the sufficiency of the evidence on the *Penn Central* factors); *Maguire Oil Co. v. City of Houston*, 243 S.W.3d 714 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (holding case was ripe for adjudication).

the protected area around Lake Houston formerly in the City's extraterritorial jurisdiction is now within the City, and it is therefore necessary to amend the Code of Ordinances to include land within the City in the control area, NOW, THEREFORE,

BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF HOUSTON, TEXAS:

Section 1. The facts recited in the preamble hereto are hereby found to be true and correct.

Section 2. Item (1) of Section 23-101, Code of Ordinances, Houston, Texas, is hereby amended to read as follows:

"(1) *Control area*: That land either in the city, or in the extraterritorial jurisdiction of the city, containing waters that flow into or adjacent to the watershed of Lake Houston."

Thus, the express purpose of the ordinance in question was to protect the public water supply of the City. There is also evidence in the record to support the conclusion that Lake Houston is a "critical" source of water for the City and that drilling for oil causes pollution. Indeed, this issue has been previously litigated and resolved against appellees. *See Trail I*, 2002 WL 389448, at *2 (explaining that the ordinances in question are valid exercises of the City's police power as a matter of law); *Trail II*, 957 S.W.2d at 625 (holding that original ordinance was a valid exercise of the police power as a matter of law)[10]; *see also Appolo Fuels, Inc. v. U.S.*, 381 F.3d 1338, 1350-51 (Fed. Cir. 2004) (identifying protection of public water supplies as important government action designed to protect the health and safety of communities).

However, appellees pose the question: why for so many years did the restriction apply only to areas in the ETJ and not areas within the city limits if a drilling restriction is essential to protect Lake Houston? The City contests this interpretation of the history of the applicable ordinances but does not cite any specific evidence supporting its

---

[10] It should be noted that the issue here—government interest as a factor under *Penn Central*—is not exactly the same as the issue addressed in *Trail I* and *Trail II*, wherein Trail alleged that the City had no legitimate interest in prohibiting new drilling near Lake Houston. *See Trail I*, 2002 WL 389448, at *2; *Trail II*, 957 S.W.2d at 625.

suggestion that the ordinances did not previously permit drilling with the city limits.[11] Appellees, however, also do not cite to any evidence that either pollution was an issue in areas where drilling was purportedly allowed (*i.e.*, inside the city limits) or the City had an ulterior motive for the restrictions in the ETJ. Given the importance of protecting the community's drinking water and possible pollution from new drilling near Lake Houston, we conclude that the first factor weighs heavily in favor of the City and against a finding of a compensable taking.

## V. Reasonable Investment-Backed Expectations

Regarding the second factor—the extent to which the regulation has interfered with the landowners' reasonable and distinct investment-backed expectations—the City alleges that there is no evidence that appellees made any investment in the property with the expectation that new wells would be drilled. In support of this proposition, the City relies primarily on stipulations filed with the court, which set forth for each appellee when and how they obtained their interest in the property and at least a portion of the income from those interests.[12] According to the stipulations, many of the appellees inherited their interests. Only one appellee obtained any part of his interest during a period in which the drilling of new wells was permitted on the property: appellee John Alexander obtained part of his interest in 1963, prior to passage of the original 1967 ordinance prohibiting new wells. Relative to a majority of appellees, the stipulations further indicate that they have "never expended any money on drilling or potential drilling activities." There is no averment in the stipulations that any money was ever expended on new drilling. Apart from these stipulations, appellees cite to no evidence, and our review of the record has revealed little evidence regarding any investment in the property.[13]

---

[11] *See supra* note 1.

[12] The amounts presented as income for most of the appellees appear fairly complete through January 2005.

[13] Although not cited or apparently relied upon by appellees, John Alexander stated in his deposition, which was considered by the trial court as evidence, that he bought a portion of his interest in

The City also relies heavily on the Texas Supreme Court's opinion in *Mayhew*, wherein the court explained that the existing regulation of a property at the time it was acquired must be considered in determining whether the landowners had reasonable investment-backed expectations. 964 S.W.3d at 937-38. According to the City, appellees have demonstrated no reasonable and distinct investment-backed expectations regarding the drilling of new wells since appellees have only shown, for the most part, investment in the properties (*i.e.*, purchasing) during periods in which an ordinance prohibiting new wells was in effect.

In response, appellees suggest that the United States Supreme Court's opinion in *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001), abrogated the reasoning in *Mayhew* upon which the City relies.[14] In *Palazzolo*, the Court held a takings claim is not barred by the mere fact that a property was transferred after enactment of a regulation but before the takings claims had ripened. *Id.* at 627-30. Appellees cite *Palazzolo* in support of the contention that their purchase of interests in the property while the prohibition was in effect—and for those who inherited the investment of their predecessors in interest (during such time or before)—should not preclude consideration of evidence of their reasonable investment-backed expectations.[15]

Appellees, however, read *Palazzolo* too broadly in suggesting that a court can never consider existing regulations in effect at the time of conveyance to evaluate

1963 before the prohibition against new drilling was enacted. Alexander further stated that there were already producing wells on the property when he purchased this interest, and therefore, he did not drill any new wells, although he believed he had the right to do so. He acknowledged his purchase had been profitable but not "real profitable."

[14] *Mayhew* addressed claims under both the Texas and federal constitutions, 964 S.W.2d at 927-28; however, the *Sheffield* court essentially instructed Texas courts to look to federal takings analysis for the proper analysis under our state constitution. *See Sheffield*, 140 S.W.3d at 669 & n.38.

[15] Although appellees suggest that they are entitled to credit for investments made by their predecessors in interest, they generally do not cite any evidence regarding what those investments were or when they were made. The one exception to this is for some transactions among the appellees themselves; for example, the stipulations indicate that John Alexander assigned some of his rights to Daystar Oil and Gas. Without evidence of what investment was made or what circumstances accompanied such investment, it is impossible to assess whether the alleged investment was tied to reasonable expectation of drilling new wells.

10

reasonable investment-backed expectations. *See id.* at 633 (O'Connor, J., concurring) ("Today's holding does not mean that the timing of the regulation's enactment relative to the acquisition of title is immaterial to the *Penn Central* analysis."). *Palazzolo* holds only that the fact of conveyance itself could not defeat a claim when that claim had not ripened before the conveyance. *Id.* at 628 ("It would be illogical, and unfair, to bar a regulatory takings claim because of the post-enactment transfer of ownership where the steps necessary to make the claim ripe were not taken, or could not have been taken, by a previous owner.").

In the present case, the takings claims based on the 1967 ordinance already have been litigated and found to be ripe. *See Trail IV*, 300 S.W.3d at 737. Furthermore, nothing in *Palazzolo* refutes the general proposition stated in *Mayhew* that the existing regulation of a property at the time it was acquired must be considered in determining whether the landowners had reasonable investment-backed expectations. *Mayhew*, 964 S.W.2d at 937-38. In fact, this statement in *Mayhew* has been reiterated by numerous justices and courts even in light of the holding in *Palazzolo*. Justice O'Connor in her concurrence in *Palazzolo* offers essentially the same pronouncement: "the regulatory regime in place at the time the claimant acquires the property at issue helps to shape the reasonableness of those [investment-backed] expectations." 533 U.S. at 633 (O'Connor, J., concurring). The Ninth Circuit explained in *Daniel v. County of Santa Barbara*:

> *Palazzolo* rejected the state court's "blanket rule" that would have found no taking whenever a purchaser was aware of existing land-use regulations that reduced the market value of property. But *Palazzolo* did not adopt the converse of that rule. That is, it did not adopt a rule that would find a taking whenever there are pre-existing restrictions on land use that reduce market value. If that were the rule, no land-use restriction would ever be safe from a takings challenge. Every new purchaser could bring a takings challenge even if there had been a taking for which the prior owner had already been compensated; if the prior owner had already litigated and lost a takings challenge to that restriction; or if the prior owner had allowed application limitations periods to lapse without creating a ripe takings claim or challenging an already-ripe claim.

288 F.3d 375, 384 (9th Cir. 2002); *see also Norman v. U.S.*, 429 F.3d 1081, 1092-93

11

(Fed. Cir. 2005) ("The purpose of consideration of plaintiffs' investment-backed expectations . . . is to limit recoveries to property owners who can demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime.") (internal quotation marks omitted); *Sheffield*, 140 S.W.3d at 678 n.88 (quoting *Mayhew*).

Lastly, appellees suggest that the investment-backed expectations factor should not apply in cases involving mineral interests. Appellees point out that the only use that can be made of a mineral estate is extraction of the minerals. They insist that if they are prohibited from drilling new wells, they are prohibited from the only use they could make of the property. Appellees do not cite any authority to support these contentions.

Moreover, Appellees' argument ignores the evidence that producing wells are already in existence on the property and misunderstands the nature of the investment-backed expectations factor. If appellees' argument were correct, a person could entitle him or herself to compensation by obtaining a mineral interest in any property, even for a nominal sum, where extraction of the minerals was prohibited. This is not the case. By definition, the purpose of the investment-backed expectation requirement is to assess whether the landowner has taken legitimate risks with the reasonable expectation of being able to use the property, which, in fairness and justice, would entitled him or her to compensation. *See, e.g., Sheffield*, 140 S.W.3d at 677-78 (downplaying significance of plaintiff's investment because it was "minimal" and "speculative"). This is true regardless of the nature of the property interest owned.[16]

Where, as here, landowners have failed to demonstrate that investments were made (*i.e.*, put at risk) in the property with the reasonable expectation that new wells could be drilled, concepts of fairness and justice do not militate in favor of compensation. Most, if not all, of appellees' evidence of investment pertains to periods of time during

---

[16] It is worth noting that in *Penn Central* itself, the Supreme Court discussed the use of the investment-backed-expectations factor in one of its earlier cases, *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), in which the interest at stake was a reservation of interest in coal. *Penn Central*, 438 U.S. at 127-28.

12

which new drilling was prohibited by ordinance. Under *Sheffield*, *Mayhew*, and the similar cases discussed above, such investment does not relate to reasonable expectations of a recovery beyond that from the existing wells. The second factor heavily favors the City.

## VI. Economic Impact

The third *Penn Central* factor concerns the economic impact of the regulation on the appellees. The proper inquiry considers the diminution in the value of the landowner's property wrought by the regulation in question. *See Sheffield*, 140 S.W.3d at 677. However, dimunition in property value, standing alone, cannot establish a taking. *Penn Central*, 438 U.S. at 131; *McMillan v. Nw. Harris Co. M.U.D.*, 988 S.W.2d 337, 342 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). As discussed above, there is considerable evidence indicating that production continues from existing wells on the property, so it cannot be said that appellees' mineral interests have been rendered valueless by the drilling prohibition. Instead, the parties' economic impact arguments primarily revolve around the proper interpretation of the City ordinance in question, which prohibits drilling within 1,000 feet of the normal water level of Lake Houston (the 45-foot elevation contour line) or any of its drains, streams, or tributaries.

Appellees contend that under the regulation, new drilling is prohibited on all of their acreage because all of it is within 1,000 feet of either the lake itself or a drainage area into the lake. The City argues that because it always has interpreted and enforced the ordinance only to prevent drilling within 1,000 feet of the normal lake level, drilling is prohibited on only 25-30% of appellees' property. The City also points out that the appellees have not attempted to obtain a permit for drilling on the other 70-75% of their property. The City and appellees disagree as to whether it is the strict language of the ordinance or the historic manner of enforcement that is more important in determining the degree of economic impact.[17] *See generally Tarrant Appraisal Dist. v. Moore*, 845

---

[17] Appellees also contend that the City waived several of its arguments by not making them before the trial court.

S.W.2d 820 (Tex. 1993) ("Construction of a statute by the administrative agency charged with its enforcement is entitled to serious consideration, so long as the construction is reasonable and does not contradict the plain language of the statute."); *see also Maguire Oil Co. v. City of Houston*, 69 S.W.3d 350, 360 (Tex. App.—Texarkana 2002, pet. denied) (applying rule from *Moore* in the inverse condemnation context).[18] The parties also dispute at length the methodologies of appellees' experts in determining that the drilling prohibition caused them millions of dollars in damages (*i.e.*, "economic impact").[19]

However, we need not wade through the details of these contentions in order to make a determination on the takings claim. For purposes of *Penn Central*, we acknowledge that appellees produced evidence of fairly significant economic impact, whether or not the City is correct that such impact was not as great as appellees alleged or the jury found. Consequently, this factor necessarily favors the appellees.

## VII. Conclusion

Of the three *Penn Central* factors, the first two, concerning the nature of the governmental action and the investment-backed expectations of the property owners, weigh quite heavily in favor of the City. As discussed, protection of a water source from pollution is a primary governmental function, and appellees demonstrated minimal, if any, reasonable and distinct investment-backed expectations. The third factor, concerning the economic impact of the regulation on the property owner, weighs in favor of appellees. Even if the City is correct that appellees were not completely restricted from drilling new wells to access the minerals, appellees established a significant economic impact. However, given the degree to which the first two factors favor the

---

[18] In the present case, we need not take and do not take any position regarding whether the Texarkana Court properly applied *Moore* to the circumstances presented in *Maguire Oil*.

[19] The jury found that the difference in the fair market value of the mineral estate of the property before and after the 1997 prohibition on drilling was over $19 million. In its final judgment, the trial court reduced this amount to just under $17 million because appellees did not own 100% of the mineral interest in question. We may generally depend on the trial court to resolve disputed fact issues even in assessing the *Penn Central* factors. *See Sheffield*, 140 S.W.3d at 673.

14

City, we do not find the weight of the third factor sufficient to demonstrate that a compensable taking has occurred under *Penn Central* and *Sheffield*. *See Appolo Fuels*, 381 F.3d at 1350-51 (holding that there was no compensatory taking where lack of reasonable investment-backed expectations coupled with government action designed to protect health and safety outweighed economic injury, even though such injury was "severe"); *Sheffield*, 140 S.W.3d at 677-78 (holding no compensable taking occurred despite "severe" economic impact of rezoning where such regulation advanced legitimate government interests and claimed investment was minimal and speculative); *Mayhew*, 964 S.W.3d at 937 (holding no compensatory taking occurred where town had legitimate interest in regulation, value of property was not completely destroyed, and no reasonable investment-backed expectations were established). With substantial government interests at stake and minimal-to-no investment-backed expectations, justice and fairness do not require compensation in this case. *See Penn Central*, 438 U.S. at 123-24.

The trial court erred in granting judgment for appellees. Consequently, we sustain the City's second issue and need not consider the remaining issues raised by the City in its appeal or by appellees in their cross-appeal.[20]

We reverse and render judgment that appellees take nothing.[21]

/s/     Martha Hill Jamison
                Justice

Panel consists of Justices Frost, Seymore, and Jamison (Frost, J., dissenting).

---

[20] As mentioned above, the City also argued that appellees' claim was barred by the statute of limitations and appellees failed to present competent evidence to support the jury's damages finding. In their cross-appeal, appellees/cross-appellants asserted that the trial court erred in granting an interest in the minerals to the City in the final judgment. Because we reverse the entire judgment of the trial court, including the portion giving a mineral interest to the City, appellees cross-appeal is rendered moot.

[21] Citing article 1, section 17 of the Texas Constitution, the dissent suggests that appellees may have been entitled to recover for inverse condemnation under a damage to property theory in addition to a taking theory. Tex. Const. art I, sec. 17. However, beyond some suggestive language in their petition and in a proposed judgment the trial court did not sign, appellees did not assert this ground of recovery in the trial court proceedings and do not mention it as an alternative ground supporting the trial court's judgment in their appellate briefing. To the contrary, appellees litigated only a takings claim. Although in its judgment the trial court used the general term "inverse condemnation," the court also awarded all right and title in the oil and gas at issue to the City, upon its satisfaction of the judgment. Moreover, in the jury charge, the court specifically told the jury: "You are instructed that the enactment of [the City's ordinance] has resulted in *a taking* of the Plaintiffs' property interests." (Emphasis added). Consequently, we disagree with the dissent's conclusion that the judgment might be confirmable on the alternative damage-in-the-absence-of-a-taking theory.