

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-17-00409-CV

THE CITY OF CROWLEY                                          APPELLANT

V.

DOUG RAY                                                    APPELLEE

----------

## FROM THE 342ND DISTRICT COURT OF TARRANT COUNTY
## TRIAL COURT NO. 342-238173-09

----------

## OPINION

----------

### I. INTRODUCTION

Appellant The City of Crowley pursues its second interlocutory appeal in this litigation stemming from Appellee Doug Ray's efforts to develop a residential subdivision in the City. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8) (West Supp. 2017). In the first four of its five issues, the City argues that the trial court lacks subject-matter jurisdiction over Ray's inverse-condemnation claim because the claim is unripe, because Ray failed to exhaust administrative

remedies, because the City is immune from suit, and because the claim fails as a matter of law. In its fifth issue, the City challenges the trial court's authority to award attorneys' fees after summarily disposing of Ray's claim for declaratory relief. We will affirm.

## II. BACKGROUND

The crux of the underlying dispute centers around Ray's complaint that the City prohibited him from developing his property in accordance with the City's adopted floodplain criteria. We do not tackle that merits question in this interlocutory appeal, because it is not before us, but it nevertheless plays a prominent role in our analysis of the City's issues. Some history is therefore required to contextualize it.

### A. Ray's Place II—Phases 1 and 2

In January 1999, the City requested that the Federal Emergency Management Agency (FEMA) revise the Flood Insurance Rate Map (FIRM) and the Flood Insurance Study (FIS) report for Tarrant County, Texas and Incorporated Areas to include a flood study that Jerry Parché Consulting Engineers performed in connection with a proposed residential subdivision located south of the North Fork of Deer Creek in the City. In response to the request, FEMA issued a Letter of Map Revision (LOMR) dated March 9, 1999, and a corrected LOMR effective July 20, 1999. In his affidavit attached to Ray's response to the City's plea to the jurisdiction, Ronald W. Morrison, a registered professional engineer, stated that the March and July 1999 LOMRs "revised the

2

FIRM and FIS reports, both dated August 2, 1995," were "reviewed by the City consultant Teague Nall and Perkins," and "were adopted by the City of Crowley."[1]

In May 1999, Ray purchased 2 two-acre tracts located adjacent to, or just north of, the North Fork of Deer Creek to develop a multifamily residential subdivision. Ray collectively named the properties Ray's Place II. The August 1995 FIRM and FIS reports, as modified by the March and July 1999 LOMRs, "cover" the properties. The 1999 LOMRs, based upon the Parché study, listed the 100-year floodplain elevation where Ray's Place II is located at 751 feet.

In October 2001, Ray submitted a preliminary plat for the entire four acres of Ray's Place II, consisting of seventeen lots and sixteen buildings. When the City requested information about the 100-year floodplain based on a fully developed watershed, Ray responded with the 1999 LOMRs. The City approved the preliminary plat.

Having decided at some point to develop Ray's Place II in two separate phases, Ray then submitted a proposed final plat for the northernmost 1.3 acres,

---

[1]Ray directs us to the following ordinance:

Sec. 42-38. Basis for establishing the areas of special flood hazard.
The areas of special flood hazard identified by the Federal Emergency Management Agency in a scientific and engineering report entitled, "The Flood Insurance Study for City of Crowley," dated August 2, 1995, with accompanying flood insurance rate maps and flood boundary-floodway maps (FIRM and FBFM), and any revisions thereto, are hereby adopted by reference and declared to be a part of this article.
(Ord. No. 95-583, art. 3, § B, 8-17-95)

which he called Ray's Place II, Phase 1.[2]  The City did not ask Ray to submit a new flood study along with the final plat, which it approved in October 2002. Thus, at least as to Phase 1's development, Ray recounted that the 1999 LOMRs were "sufficient to provide the information regarding the 100-year floodplain location."  Ray obtained building permits, constructed six fourplexes, and leased the units before selling them in May 2005 for approximately $242,000 per lot.

Ray began developing Phase 2—the southern 2.7 acres of Ray's Place II—around December 2006.  As happened with Phase 1, when Ray submitted a preliminary plat for Phase 2 (covering lots 1–6 and 13–17), the City requested that he supply information about the 100-year floodplain, and Ray responded that he was relying upon the figures contained in the Parché study, which were incorporated into the FIRM via the 1999 LOMRs.  The City approved the preliminary plat in April 2007.

The following month, Ray submitted a proposed final plat for Phase 2, but unlike with the Phase 1 development, the City informed Ray that he had to have a new flood study performed.  Ray complied and submitted a new flood study by Nave Engineering, Inc.  The Nave study touched on the City's reason for requesting an updated flood study:

> In 1998 Jerry Parche Consulting Engineers (JPC) submitted a LOMR request for the North Fork of Deer Creek for the Stone Brook Addition to the south of the project site.  At that time the rational

---

[2]The Phase 1 lots "are the ones farthest from the" North Fork of Deer Creek.

method was used to determine the 100-year runoff discharge for the site.

Since that time Teague Nall and Perkins (TNP) has conducted [a] flood study and replaced the culverts at S. Hampton Road just downstream of the project site. At that time it was determined that the discharge for the North Fork of Deer Creek was higher than the flows found in the JPC study. Additionally Carter and Burgess, Inc. (CBI) conducted a flood study for the proposed Creekside Addition upstream of the project site and produced discharges similar to those found in the TNP study. As a result the City of Crowley requested that the North Fork of Deer Creek hydrology and hydraulic models be updated for the proposed project.

Neither side offers much insight into the specific results of the Nave study, but it evidently affected the City's opinion about the minimum finished floor elevations for Phase 2. Specifically, both Ray and Cheryl McClain, the City's planning and zoning administrator, explained that the City requires finished floor elevations to be, at a minimum, two feet above a property's floodplain elevation. Relying on the 1999 LOMRs, which were based on the Parché study and which set the 100-year floodplain elevation for the location of Ray's Place II at 751 feet, Ray testified that to build Phase 2, the minimum finished floors would have to be no less than 753 feet and that the Phase 2 buildings were initially designed to have a finished floor elevation of 755 feet. But instead of "allow[ing him] to develop [Phase 2] using the effective floodplain" elevation of 751 feet, Ray testified that the City is requiring that the finished floors be "10 feet above the City's current floodplain criteria," or at an elevation of no less than 761 feet.[3] Ray

---

[3]To be precise, the final plat, which the City ultimately approved, reflects that the figure is 761.5 feet.

5

calls the City's minimum 761.5-foot finished floor elevation arbitrary, but Teague Nall and Perkins advised the City in a memo that "[t]he updated flood study [the Nave study] will be used for establishing minimum finished floor elevations," and page seven of the Nave study contains the following statement:

> C. Minimum Finished Floors
>
> The minimum finished floors for lots adjacent to the floodplain are 761.50'. This elevation is 2.00' above the 100-year floodplain water surface.

It thus appears that the Nave study did not reach the same conclusion that the Parché study had about the 100-year floodplain elevation for the area where Phase 2 is located and that the City is utilizing the Nave study's figures, not the 1999 LOMRs'.[4]

Ray estimated that to raise the property up by 10 feet, he would have "to bring in about 270,000 yards of dirt, build retaining walls, pour more footings on foundations to taper up because it starts right at the edge of the original Phase 1. We couldn't put one unit on it without raising the dirt." He opined that it is no longer economically feasible to develop the property and that it has no potential use without "raising the dirt."

---

[4]Greg Saunders of Teague Nall and Perkins opined in an affidavit that the FIRM and FIS "do not control the location of the 100 year flood plain; they merely identify the location of the 100 year flood plain as of the date of the adoption of the FIRM by the city." He continued, "If the developer's updated drainage study shows that the 100 year flood plain is different than what is shown in the FIRM, the information contained in the updated drainage study controls the development criteria for the Property, not the FIRM or FIS."

**B.      Litigation**

In 2009, Ray sued the City for declaratory relief and Teague Nall and Perkins for negligence and other claims.  The City argued in a plea to the jurisdiction that it was immune from Ray's suit because he had failed to allege a valid claim for declaratory relief, but the trial court denied the City's plea, and this court affirmed the trial court's interlocutory order.  *See City of Crowley v. Ray*, No. 02-09-00290-CV, 2010 WL 1006278, at *5, *7 (Tex. App.—Fort Worth Mar. 18, 2010, no pet.) (mem. op.).  Before the trial court granted the City summary judgment on some of Ray's claims for declaratory relief, Ray filed an amended petition that added a claim against the City for inverse condemnation, averring that the City's actions effected an unconstitutional taking of property.  The City then filed another jurisdictional plea, this time arguing that Ray's inverse-condemnation claim is unripe and that its governmental immunity had not been waived.  After a hearing at which testimonial and documentary evidence was admitted, the trial court denied the City's plea, and this interlocutory appeal followed.[5]

### III. STANDARD OF REVIEW

The City premised its jurisdictional challenge on both ripeness and governmental immunity.  Ripeness, like standing, is a component of subject-matter jurisdiction and may be raised in a plea to the jurisdiction.  *Mayhew v.*

---

[5]The trial court issued findings of fact and conclusions of law.

7

*Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998), *cert. denied*, 526 U.S. 1144 (1999). Immunity from suit likewise defeats a trial court's subject-matter jurisdiction and is therefore properly asserted in a plea to the jurisdiction. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004).

A plea to the jurisdiction may challenge either the pleadings or the existence of jurisdictional facts. *Id.* at 226–27. When the pleadings are challenged, we consider whether the pleader has alleged sufficient facts to demonstrate the court's subject-matter jurisdiction over the matter, construing the pleadings liberally in favor of the plaintiff and looking to the pleader's intent. *Id.*; *see City of Waco v. Kirwan*, 298 S.W.3d 618, 621 (Tex. 2009). When the existence of jurisdictional facts is challenged, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues that have been raised. *Miranda*, 133 S.W.3d at 227. If the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* at 228. We review a trial court's ruling on a plea to the jurisdiction under a de novo standard. *Id.*

## IV. FINAL DECISION RIPENESS AND EXHAUSTION OF ADMINISTRATIVE REMEDIES

In its first issue, the City argues that Ray's inverse-condemnation claim is not ripe for judicial review because the City has made no final decision involving Phase 2's development. In its second issue, which the City joins with its first, the City contends that Ray failed to exhaust administrative remedies or other

8

procedures that might have alleviated the alleged regulatory taking. Ray responds that dismissal is inappropriate under either theory.

## A.    Regulatory takings

Article I, section 17 of the Texas constitution, the "takings clause," mandates that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person . . . ." Tex. Const. art. I, § 17. When the State takes private property for public use without just compensation, the property owner may seek just compensation through a cause of action for inverse condemnation. *State v. Clear Channel Outdoor, Inc.*, 274 S.W.3d 162, 164 (Tex. App.—Houston [1st Dist.] 2008, no pet.). The proceeding is "inverse" because the property owner brings the suit, as compared to a condemnation proceeding brought by a governmental entity to appropriate private property for a public purpose. *City of Carrollton v. HEB Parkway S., Ltd.*, 317 S.W.3d 787, 792 (Tex. App.—Fort Worth 2010, no pet.).

A taking can take the form of a physical invasion of property or a regulation that imposes some limitation on how the property can be used. *Lowenberg v. City of Dallas*, 168 S.W.3d 800, 801 (Tex. 2005). Ray's inverse-condemnation claim complains of the latter, a regulatory taking violative of article I, section 17 of the Texas constitution. *See* Tex. Const. art. I, § 17. The City largely bases its ripeness argument on federal regulatory takings jurisprudence, but that is no problem because we look to federal jurisprudence construing and applying the

9

Fifth Amendment when analyzing article I, section 17. *See Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 669 (Tex. 2004).

The United States Supreme Court has identified two categories of regulatory action that generally will be deemed per se takings under the Fifth Amendment. *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538, 125 S. Ct. 2074, 2081 (2005). One categorical rule covers regulations that completely deprive an owner of all economically beneficial use of the owner's property. *Id.*, 125 S. Ct. at 2081 (citing *Lucas v. S. Carolina Coastal Comm'n*, 505 U.S. 1003, 112 S. Ct. 2886 (1992)). The other requires an owner to suffer a permanent physical invasion of her property, no matter how small. *Id.*, 125 S. Ct. at 2081 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S. Ct. 3164 (1982)). Regulatory-takings challenges not covered by these two categories (or by exaction standards) are governed by the factors analysis set out in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S. Ct. 2646 (1978). *Id.* at 538–39, 125 S. Ct. at 2081–82.

## B.    Ripeness

### 1.    Final decision

As with any other claim, to be justiciable, an inverse-condemnation claim premised upon a regulatory taking must be ripe for judicial review.[6] *Mayhew v. Town of Sunnyvale*, 964 S.W.2d at 928–29. A regulatory takings claim ordinarily

---

[6]Again, we may look to federal authorities when considering ripeness challenges to regulatory-takings claims. *See Mayhew*, 964 S.W.2d at 928–29.

10

"is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186, 105 S. Ct. 3108, 3116 (1985). Stated differently, ripeness requires "a final and authoritative determination of the type and intensity of development legally permitted on the subject property." *MacDonald, Sommer & Frates v. Yolo Cty.*, 477 U.S. 340, 348, 106 S. Ct. 2561, 2566 (1986). A final decision is necessary because it establishes, with sufficient certainty, what limitations will be placed on the property. *See id.* at 350–51, 106 S. Ct. at 2567. "Although there is no single rule dispositive of all questions of finality, courts . . . should treat as final a decision 'which is definitive, promulgated in a formal manner and one with which the agency expects compliance.'" *Texas-New Mexico Power Co. v. Tex. Indus. Energy Consumers*, 806 S.W.2d 230, 232 (Tex. 1991) (quoting 5 J. Stein, G. Mitchell & B. Mezines, Administrative Law 48-10 (1988)).

### 2. The City made a final decision

The City first argues that Ray's inverse-condemnation claim is unripe for the following reason:

> [Ray's] only requests have been to develop Phase 2 to the fullest extent possible, forcing as many lots, residential units, and buildings on the 2.7-acre property as legally and practically possible. His takings theory is based on the assumption that full development of the property with as many four-plexes and buildable lots as physically possible will require considerable expense to raise the finished floors of each structure to two feet above base flood

11

> elevation as determined by [Ray's] engineer. . . . Moreover, [Ray's] only development proposal is to build virtually identical two-story four-plexes on each lot with two residences on the first floor. [Ray's] proposal does not consider the option of structures with vehicle garage or uninhabitable storage space on the ground floor.

The argument, quite clearly, attempts to analogize the facts of this case to those in *MacDonald* and, consequently, seeks to obtain the same result that the governmental entity in that case achieved. The analogy is inappropriate.

In *MacDonald*, the petitioner submitted a proposal to subdivide a tract of land into 159 single-family and multifamily residential lots. *MacDonald*, 477 U.S. at 342, 106 S. Ct. at 2563. The county rejected the plan for several reasons, including issues involving inadequate access, sanitation services, and police protection, and the petitioner immediately filed suit. *Id.* at 343–44, 106 S. Ct. at 2563–64. Siding with the county, the California court of appeals observed that the petitioner's claim failed because it had sought "approval of a particular and relatively intensive residential development," the "denial [of which could not] be equated with a refusal to permit any development"; "[l]and use planning is not an all-or-nothing proposition. A governmental entity is not required to permit a landowner to develop property to [the] full extent he might desire or be charged with an unconstitutional taking of the property." *Id.* at 347, 106 S. Ct. at 2565. Connecting the state appellate court's reasoning to its final-decision jurisprudence, the Supreme Court stressed the difficulty (or impossibility) of attempting to determine whether a regulatory taking had occurred before the governmental entity makes a final decision that applies the relevant regulation to

12

the property.  *Id.* at 348–51, 106 S. Ct. at 2566–567.  "Our cases uniformly reflect an insistence on knowing the nature and extent of permitted development before adjudicating the constitutionality of the regulations that purport to limit it."  *Id.* at 351, 106 S. Ct. at 2567.  Because there was a possibility that some development would be permitted, and because the petitioner had not received a final decision from the county, the Supreme Court concluded that the petitioner's claim was not ripe.  *Id.* at 351–52, 106 S. Ct. at 2567–68.

Unlike the petitioner in *MacDonald*, Ray did not dash to the courthouse and file suit immediately after the City denied a proposal to intensively develop Ray's Place II "to the fullest extent possible."  Instead, Ray claims that by requiring him to raise the minimum finished floor elevation to ten feet above "the current adopted floodplain criteria" instead of only two feet, the City has prohibited him from developing Phase 2 using "the effective floodplain," rendering the property's development economically unfeasible in light of the costs associated with "raising the dirt."  And from our review of the record, the City would probably insist on the same requirement even if Ray proposed a less intense development.  Thus, the nature of the alleged taking is not one that left open the possibility that the property could be developed some other way, thereby precluding a final decision on the type and intensity of the development.

13

The City also argues that Ray's regulatory-taking claim is not ripe because "[t]here were no variances, flood determination appeals, CLOMRs,[7] [or] administrative determination appeals requested or filed." But "[t]he futility of complying with applicable administrative procedures has been recognized as an exception to the ripeness doctrine in takings cases." *Barlow & Haun, Inc. v. United States*, 118 Fed. Cl. 597, 617 (2014); *see Mayhew*, 964 S.W.2d at 929 (observing that "futile variance requests or re-applications are not required"). The record shows that the City formally approved Phase 2's final plat with a minimum finished floor elevation of 761.5 feet, that the City stressed through its questioning of Ray at the hearing on the plea that Phase 2 must not be developed so that it is amenable to flooding and is unsafe, and that Ray sought to develop Phase 2 in accordance with the "effective floodplain" for the location, not contrary to it. In its reply brief, the City states that "it is audacious to suggest the City should or even that it has the legal authority to ignore the results of the Nave study." We think the record fairly shows that the City has taken the definitive position that the minimum finished floor elevations for Phase 2 must be no lower than ten feet above 751 feet and that Ray's pursuing a variance or other administrative procedure at this point would be futile.

---

[7]CLOMR is an acronym for conditional letter of map revision, "FEMA's comment on a proposed project that would, upon construction, affect the hydrologic or hydraulic characteristics of a flooding source and thus result in the modification of the existing regulatory floodway." *City of Keller v. Hall*, 433 S.W.3d 708, 717 & n.51 (Tex. App.—Fort Worth 2014, pet. denied) (citing 44 C.F.R. § 72.2 (West, Westlaw through Aug. 10, 2018)).

As we observed at the outset, the dispute stems from the City's decision to utilize the Nave study's flood-elevation data instead of the 1999 LOMRs'. The City's decision on the minimum finished floor elevation is definitive, sufficiently formal, and one with which the City certainly expects compliance. *See Texas-New Mexico Power Co.*, 806 S.W.2d at 232. Ray's inverse-condemnation claim is not unripe for lacking a final decision by the City. We overrule the City's first issue.

## C. Exhausting administrative remedies

The City supports its second issue—that Ray failed to exhaust administrative remedies—with the same argument that it used to support the second half of its first issue: "There were no variances, flood determination appeals, CLOMRs, [or] administrative determination appeals requested or filed." But while questions of ripeness and exhaustion of administrative remedies often overlap, they involve "distinct and separate inquiries." *Garrett Operators, Inc. v. City of Houston*, 360 S.W.3d 36, 41 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). "The requirement of a final decision, in [the] context of an inverse condemnation case, concerns whether the governmental entity charged with implementing the regulation that allegedly caused the taking has fixed some legal relationship between the parties." *Id.* at 41–42 (citing *Texas-New Mexico Power Co.*, 806 S.W.2d at 232). "In contrast, exhaustion of administrative remedies concerns whether an agency has exclusive jurisdiction in making an initial determination on the matter in question and whether the plaintiff has exhausted

15

all required administrative remedies before filing a claim in the trial court." *Id.* at 42. The City directs us to two cases that aptly address the latter concept: *City of Dallas v. Stewart*, 361 S.W.3d 562 (Tex. 2012) (op. on reh'g), and *City of Dallas v. VSC, LLC*, 347 S.W.3d 231 (Tex. 2011).

In *VSC*, the supreme court concluded that VSC had prematurely sued the City of Dallas for unconstitutionally taking its vehicles because VSC had failed to first utilize the remedial statutory procedure contained in code of criminal procedure chapter 47. 347 S.W.3d at 234–37. In contrast, in *Stewart*, the supreme court reasoned that Stewart had properly asserted her takings claim in district court after having first challenged an administrative board's determination that her property was an urban nuisance. 361 S.W.3d at 579. The logical rationale sustaining both cases is straightforward: If the legislature has made available a statutory procedure that may provide compensation, then "recourse may be had to a constitutional suit only where the procedure proves inadequate." *VSC, LLC*, 347 S.W.3d at 236; *see Williamson Cty. Reg'l Planning Comm'n*, 473 U.S. at 194–95, 105 S. Ct. at 3121 ("If the government has provided an adequate process for obtaining compensation, and if resort to that process 'yield[s] just compensation,' then the property owner 'has no claim against the [g]overnment' for a taking." (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1013, 104 S. Ct. 2862, 2878 (1984))).

The City argues that Ray never "sought to formally appeal any administrative determination under the City's subdivision ordinance or flood

16

prevention regulations," but the City does not disclose or otherwise direct us to any remedial statutory scheme that Ray should have utilized before suing the City, nor do we feel compelled to rummage through the City's ordinances in search of some supposed administrative procedure without any guidance from the parties. *See Stewart*, 361 S.W.3d at 565–66 (identifying subchapter C of local government code chapter 54 and Dallas ordinances); *VSC, LLC*, 347 S.W.3d at 234 (identifying code of criminal procedure chapter 47).

The City complains that Ray never sought a variance or an LOMR, but neither procedure would have obviated the need to file the underlying suit because Ray sought to design Phase 2 so that its minimum finished floor elevations complied with, not varied from, the floodplain elevation that the City had allegedly adopted. *See Variance*, Black's Law Dictionary (10th ed. 2014) (defining variance to mean "[a] license or official authorization to *depart* from a zoning law") (emphasis added)). We cannot conclude that the City met its initial burden to prove that Ray's failure to exhaust administrative remedies deprived the trial court of subject-matter jurisdiction over his inverse-condemnation claim. We overrule the City's second issue.

## V. DIRECT CITY ACTION OR CAUSATION

In its third issue, the City argues that its governmental immunity has not been waived because Ray failed to allege or produce any evidence that the City intentionally and directly acted to cause a taking.

17

Governmental immunity is not waived when a plaintiff fails to allege a valid inverse-condemnation claim. *City of Argyle v. Pierce*, 258 S.W.3d 674, 683 (Tex. App.—Fort Worth 2008, pets. dism'd). To state a cause of action for inverse condemnation under the Texas constitution, a plaintiff must allege (1) an intentional governmental act, (2) that resulted in a taking of property, (3) for public use. *Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001). "The governmental entity sued must have taken direct governmental action, or have been the proximate cause, of the harm." *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 484 (Tex. 2012), *cert. denied*, 569 U.S. 947 (2013).

The City directs us to *Hearts Bluff*. There, the plaintiff purchased approximately 4,000 acres of bottomland in Northeast Texas to create a federal mitigation bank. *Id.* at 473. The land purchased fell within the bounds of a site long identified by the State as a possible drinking water reservoir to service the DFW area—the potential Marvin Nichols Reservoir. *Id.* at 474. The United States Army Corps of Engineers ultimately denied the plaintiff's application for a permit because the mitigation bank would not exist in perpetuity if the legislature chose to build the reservoir. *Id.* at 475. The plaintiff then sued the State for inverse condemnation, theorizing that the Corps denied the permit because the legislature had approved a 2006 water plan issued by the Texas Water Development Board that recommended conferring a "unique" designation on the potential reservoir site, which effectively destroyed the perpetuity requirement for

18

mitigation banking. *Id.* at 475, 479. The supreme court concluded that the plaintiff had not alleged a valid takings claim because the Corps denied the permit, not the State, and because the State did not directly restrict the land by merely designating the property as "unique." *Id.* at 481.

The City claims that Ray relies upon the following "specific allegations of direct action" to support his inverse-condemnation claim: he "bought the property under the impression or unaware that it was affected or impacted by the 100-year flood plain," he "proceeded with development of the second phase relying on the 1995 FIRM as modified by the 1999 LOMR," and "the City and TNP required [him] to obtain a new flood study." The City argues that because Ray's claim "focus[es] on the location of the 100-year floodplain across Phase Two," it cannot be held liable for any regulatory taking "based on the location of the 100-year flood plain or the federally-mandated regulations which accompany that designation." The City thus contends that like the plaintiff in *Hearts Bluff*, who failed to state a valid claim by seeking to hold the State liable for the Corps' unilateral act of denying the permit, Ray has failed to state a valid claim by seeking to hold the City liable under a takings theory that is premised upon the floodplain elevation as set by the 1999 LOMRs. The City's attempt to shift responsibility is unpersuasive (not to mention contrary to basic notions of proximate causation).

As we have repeatedly clarified, Ray sued the City because *it* prohibited him from developing Phase 2 using the "effective" floodplain criteria. That Ray

19

sought to develop Phase 2 using the figures contained in the 1999 LOMRs does not mean that the LOMRs are responsible for the City's refusal to utilize them during the development stage. Ray thus complains of direct, governmental action by the City, and he submitted supporting jurisdictional evidence. If any comparison can be made between *Hearts Bluff* and this case, the complained-of action taken by the City here is much more akin to the Corps' denial of the application for the mitigation bank permit than to the State's conduct in identifying the land as a potential reservoir site. We overrule the City's third issue.

## VI. *Lucas* Claim

In its fourth issue, the City argues that Ray's *Lucas* claim fails as a matter of law because "the relevant parcel for takings analysis must include the Phase 1 lots," which Ray was able to develop, rent, and sell to investors for a profit, thereby eliminating Phase 2's alleged economical-value deficiency. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 330, 122 S. Ct. 1465, 1483 (2002) (observing that *Lucas* holding "was limited to 'the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted'") (quoting *Lucas*, 505 U.S. at 1017, 112 S. Ct. at 2894)). The City contends that Phase 1 and Phase 2 should be treated as one property for purposes of a value determination because Ray purchased Phase 1 and Phase 2 at the same time and because Ray initially attempted to develop the entire four acres simultaneously.

20

The United States Supreme Court recently explained how a court should identify the relevant parcel for purposes of determining whether a regulatory taking has occurred, a potentially outcome-determinative issue. *See Murr v. Wisconsin*, 137 S. Ct. 1933, 1945–46 (2017). Consistent with its sustained hesitance to craft inflexible, categorical rules in regulatory-takings cases, the Supreme Court opted to utilize a factors analysis, which includes the treatment of the land under state and local law, the physical characteristics of the land, and the prospective value of the regulated land. *Id.* Ultimately, "[t]he endeavor should determine whether reasonable expectations about property ownership would lead a landowner to anticipate that his holdings would be treated as one parcel, or, instead, as separate tracts." *Id.* at 1945.

We disagree that Phase 1 has any relevance to Phase 2's value determination. Ray purchased the properties at the same time, but we fail to see how the timing of the purchases alone could effectively override the separate legal identity of each tract, nor does the City direct us to any local or state law that requires the tracts to be treated as one. And although Ray initially submitted a preliminary plat to develop both tracts at once, he ultimately decided to develop the properties in two separate phases and submitted a final plat for only Phase 1.

Ray then proceeded to develop Phase 1, lease the units, and later sell them. All of this happened before Phase 2's development ever commenced.[8]

Moreover, as Ray observes, unlike with Phase 2, the City permitted Phase 1 to be built using the flood-elevation figures contained in the 1999 LOMRs. The dispute between the parties over the applicable base floodplain elevation and related minimum finished floor elevation thus has no effect on Phase 1's long-completed units. Further, unlike the properties at issue in *Murr*, which were located along the Lower St. Croix River and subject to state law regulating their development, there is nothing in the record to indicate that the Phase 1 and Phase 2 properties are located in an area that is, or may at some point in the future become, subject to "environmental or other regulation." *See id.* at 1940, 1945–46.

The *Murr* factors and other relevant considerations weigh against treating Phase 1 and Phase 2 as a single unit for purposes of making an economic-value determination. We overrule the City's fourth issue.

## VII. ATTORNEYS' FEES

In its fifth and final issue, the City argues that we should dismiss Ray's still-pending claim for attorneys' fees because the trial court, by summary judgment, disposed of the request for declaratory relief upon which the fees were

---

[8]Ray sold the Phase 1 units in May 2005. He contacted Bill Boomer and began developing Phase 2 in December 2006. Ray testified that he did "[n]othing" with Phase 2 between 2002 and 2006.

22

predicated, and in the absence of a valid waiver of immunity, attorney's fees are not recoverable under the Uniform Declaratory Judgments Act. But as Ray points out, the trial court has not made any award of attorneys' fees one way or the other; this is an interlocutory appeal, and no final judgment has been entered. With no award of attorneys' fees, any analysis by this court at this point would be purely advisory and improper. *See In re Fort Worth Star-Telegram*, 441 S.W.3d 847, 857 (Tex. App.—Fort Worth 2014, orig. proceeding) ("The Texas constitution's separation of powers provision prohibits courts from issuing advisory opinions that decide abstract questions of law."). We therefore overrule the City's fifth issue.[9]

## VIII. CONCLUSION

Having overruled the City's five issues, we affirm the trial court's order denying the City's jurisdictional plea.[10]

/s/ Bill Meier
BILL MEIER
JUSTICE

---

[9]Insofar as we may not have accurately identified the City's fifth issue, it is waived as inadequately briefed. *See* Tex. R. App. P. 38.1(i) (requiring brief to contain clear and concise argument for contention made).

[10]As we are bound to do, we conducted a responsive analysis of only the five specific issues that the City raised in its briefing on appeal. Our opinion, therefore, should not be broadly construed as an endorsement that Ray otherwise alleged a valid takings claim upon which relief may be granted.

23

PANEL:  SUDDERTH, C.J.; WALKER and MEIER, JJ.

DELIVERED:  August 23, 2018